[Cite as *Glenn v. Columbus*, 2016-Ohio-7011.]

## IN THE COURT OF APPEALS OF OHIO

## TENTH APPELLATE DISTRICT

William R. Glenn, Individually : 
and as Executor of the Estate 
of Elvyra T. Glenn (Deceased), :

                Plaintiff-Appellee, :

v. :

City of Columbus et al., :

                Defendants-Appellants. :

No. 16AP-15
(C.P.C. No. 14CV-12177)

(REGULAR CALENDAR)

---

# D E C I S I O N

## Rendered on September 27, 2016

---

**On brief:** *Curry, Roby & Mulvey Co., LLC, Robert S. Roby*, *Lisa C. Haase*, and *Bruce A. Curry*, for appellee. **Argued:** *Lisa C. Haase.*

**On brief:** *Richard C. Pfeiffer, Jr.*, City Attorney, *Michael R. Halloran*, and *Janet Hill Arbogast,* for appellants. **Argued:** *Michael R. Halloran.*

---

APPEAL from the Franklin County Court of Common Pleas

LUPER SCHUSTER, J.

{¶ 1} Defendants-appellants, City of Columbus ("city") and Paul Sheridan, appeal from a judgment of the Franklin County Court of Common Pleas denying their joint motion for summary judgment in a lawsuit filed by plaintiff-appellee, William R. Glenn ("executor"), individually and as executor of the estate of Elvyra T. Glenn. For the following reasons, we affirm in part and reverse in part.

## I. Facts and Procedural History

{¶ 2}  This matter arises from a collision between an automobile driven by Elvyra Glenn ("Glenn") and a city fire truck ("Engine 32") driven by firefighter Sheridan. At approximately 3:09 p.m., on November 12, 2013, Engine 32 was dispatched to respond to a fire alarm at an elementary school. In addition to Sheridan, firefighters Tyler Heisterkamp and Dave Stone were on Engine 32.  Sheridan drove Engine 32 through a curve and approached the Refugee Road and Brice Road intersection intending to go straight through the intersection to reach the elementary school.  The fire truck's emergency lights were on, and Sheridan activated the air horn in short bursts.  Because vehicles were stopped in the lane where cars were going straight, Sheridan maneuvered Engine 32 into the left turn lane.  The light was red for Sheridan but all incoming traffic was either stopped or, at most, one vehicle (driven by Glenn) was travelling at a slow speed.  Sheridan did not stop Engine 32 and proceeded into the intersection.  On entering the intersection, Engine 32 struck Glenn's small sedan.  Glenn died from injuries she sustained in the collision.

{¶ 3}  In November 2014, the executor sued the city and the fire truck driver, identified in the complaint as "John Doe."  In August 2015, the city moved for summary judgment, claiming immunity under R.C. Chapter 2744.  In September 2015, the trial court granted the executor leave to file an amended complaint naming Sheridan as the fire truck driver.  In view of the amended complaint, the city withdrew its August 2015 motion for summary judgment and, on September 17, 2015, joined Sheridan in moving for summary judgment, with both claiming immunity under R.C. Chapter 2744.  In December 2015, the trial court denied the city and Sheridan's joint motion for summary judgment.  The court found that because reasonable minds could disagree as to whether Sheridan operated Engine 32 in a wanton or reckless manner, the city and Sheridan failed to demonstrate their entitlement to judgment as a matter of law on immunity grounds.

{¶ 4}  The city and Sheridan timely appeal.[1]

---

[1] Generally, the denial of a motion for summary judgment is not a final, appealable order.  *Stevens v. Maxson*, 10th Dist. No. 12AP-672, 2013-Ohio-5792, ¶ 8.  However, R.C. 2744.02(C) provides that "[a]n order that denies a political subdivision or an employee of a political subdivision the benefit of an alleged immunity from liability as provided in this chapter or any other provision of the law is a final order."

## II.  Assignments of Error

{¶ 5}  The city and Sheridan assign the following errors for our review:

1. The trial court erred when it denied the motion for summary judgment filed by Defendant-Appellant City of Columbus.

2. The trial court erred when it denied the motion for summary judgment filed by Defendant-Appellant Paul Sheridan.

## III.  Standard of Review

{¶ 6}  This court's review of a trial court's decision on summary judgment is de novo.  *Bonacorsi v. Wheeling & Lake Erie Ry. Co.*, 95 Ohio St.3d 314, 2002-Ohio-2220, ¶ 24.  Summary judgment is appropriate only when the moving party demonstrates (1) no genuine issue of material fact exists, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds could come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence most strongly construed in its favor.  Civ.R. 56(C); *State ex rel. Grady v. State Emp. Relations Bd.*, 78 Ohio St.3d 181, 183 (1997).

{¶ 7}  Pursuant to Civ.R. 56(C), the moving party bears the initial burden of informing the trial court of the basis for the motion and identifying those portions of the record demonstrating the absence of a material fact.  *Dresher v. Burt*, 75 Ohio St.3d 280, 293 (1996).  However, the moving party cannot discharge its initial burden under this rule with a conclusory assertion that the nonmoving party has no evidence to prove its case; the moving party must specifically point to evidence of the type listed in Civ.R. 56(C) affirmatively demonstrating that the nonmoving party has no evidence to support the nonmoving party's claims.  *Id.*; *Vahila v. Hall*, 77 Ohio St.3d 421, 429 (1997).  Once the moving party discharges its initial burden, summary judgment is appropriate if the nonmoving party does not respond, by affidavit or as otherwise provided in Civ.R. 56, with specific facts showing that a genuine issue exists for trial.  *Dresher* at 293; *Vahila* at 430; Civ.R. 56(E).

## IV.  Discussion

### A.  First Assignment of Error – the City's Immunity

{¶ 8}   The city and Sheridan's first assignment of error alleges the trial court erred in denying the city's motion for summary judgment.  The city and Sheridan argue the city is immune from liability as a matter of law because Sheridan did not operate Engine 32 in a manner constituting willful or wanton misconduct.  We agree.

{¶ 9}   Pursuant to the Political Subdivision Tort Liability Act, codified in R.C. Chapter 2744, we apply a three-tiered analysis to determine the immunity of a political subdivision.  *Colbert v. Cleveland*, 99 Ohio St.3d 215, 2003-Ohio-3319, ¶ 7; *Yonkings v. Piwinski*, 10th Dist. No. 11AP-07, 2011-Ohio-6232, ¶ 18.  First, the general rule is political subdivisions are not liable generally for injury or death to persons in connection with a political subdivision's performance of a governmental or proprietary function.  *Howard v. Miami Twp. Fire Div.*, 119 Ohio St.3d 1, 2008-Ohio-2792, ¶ 18; *see* R.C. 2744.02(A)(1) ("[e]xcept as provided in division (B) of this section, a political subdivision is not liable in damages in a civil action for injury, death, or loss to person or property allegedly caused by any act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental or proprietary function.").  Next, we consider whether any of R.C. 2744.02(B)'s enumerated exceptions to the general rule of immunity applies.  *Howard* at ¶ 18.  As relevant here, R.C. 2744.02(B)(1) states, "[e]xcept as otherwise provided in this division, political subdivisions are liable for injury, death, or loss to person or property caused by the negligent operation of any motor vehicle by their employees when the employees are engaged within the scope of their employment and authority."  R.C. 2744.02(B)(1)(b) sets forth a full defense to that liability when a fire department employee operates a motor vehicle in response to an emergency and the "operation of the vehicle did not constitute willful or wanton misconduct."  Finally, if there is an applicable exception, we then determine whether any of the statutory defenses of R.C. 2744.03 apply.  *Howard* at ¶ 18.

{¶ 10} The executor argues the city is liable because Sheridan operated Engine 32 in a manner constituting willful and wanton misconduct and because the city failed to properly train its employees, supervise its employees, and enforce its own policies.  We are unpersuaded by these arguments.

{¶ 11} It is undisputed that the city, as a political subdivision performing a government function, qualifies for immunity under R.C. 2744.02(A)(1). It is also undisputed that Sheridan was operating Engine 32, a motor vehicle, while responding to an emergency call. The executor's argument, that the city is liable because the vehicle collision resulted from the city's failure to properly train, supervise, and enforce its rules, lacks merit. R.C. 2744.02(B) does not contain an independent exception to a political subdivision's immunity under R.C. 2744.02(A)(1) for the failure to train, supervise, or enforce its own policies. *See Digiorgio v. Cleveland*, 8th Dist. No. 95945, 2011-Ohio-5878, ¶ 33 ("there is no exception to [a city's] immunity for the training, supervision, or discipline of police officers"). Therefore, the dispute regarding the city's liability centers on the applicability of R.C. 2744.02(B)(1)(b). As to that issue, the city and Sheridan argue that R.C. 2744.02(B)(1)(b) applies because Sheridan did not operate Engine 32 in a manner that constituted willful or wanton misconduct. The executor argues the trial court properly determined that genuine issues of material fact remain as to Sheridan's conduct.

{¶ 12} The Supreme Court of Ohio has explained the different degrees of care relevant to the liability of a political subdivision or an employee of a political subdivision. In *Anderson v. Massillon*, 134 Ohio St.3d 380, 2012-Ohio-5711, the Supreme Court noted that "a political subdivision has a full defense to liability when the conduct involved is not willful or wanton, and therefore, if the conduct is only reckless, the political subdivision has a full defense to liability." *Id.* at ¶ 23. Additionally, the Supreme Court clarified that "[t]he terms 'willful,' 'wanton,' and 'reckless' as used in [the political subdivision liability] statutes are not interchangeable." *Id.* at ¶ 40.

{¶ 13} Willful misconduct, as the Supreme Court defines it, "implies an intentional deviation from a clear duty or from a definite rule of conduct, a deliberate purpose not to discharge some duty necessary to safety, or purposefully doing wrongful acts with knowledge or appreciation of the likelihood of resulting injury." *Id.* at ¶ 32, citing *Tighe v. Diamond*, 149 Ohio St. 520, 527 (1948). Willful misconduct involves the intent to injure. *Id.* at ¶ 26, citing *Tighe*. Wanton misconduct, however, "is the failure to exercise any care toward those to whom a duty of care is owed in circumstances in which there is great probability that harm will result." *Anderson* at ¶ 33, citing *Hawkins v. Ivy*, 50 Ohio St.2d

114, 117-18 (1977). Lastly, reckless conduct is "the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct." *Anderson* at ¶ 34, citing *Thompson v. McNeill*, 53 Ohio St.3d 102, 104-05 (1990).

{¶ 14} Therefore, as it relates to the city's liability, at issue is whether, based on the evidence submitted, reasonable minds could disagree as to whether Sheridan operated Engine 32 in a manner constituting willful or wanton misconduct. The evidence before the trial court included the affidavit and deposition testimony of firefighters Sheridan, Heisterkamp, Donald Sulsburey, and nongovernment accident witnesses Leslie Allmendinger, Keith Castle, and Brian Bendik. As pertinent to the issues presented in this appeal, the evidence demonstrated the following.

{¶ 15} Sheridan and Heisterkamp testified that, when they exited the fire station to respond to the elementary school's fire alarm, Sheridan had already activated the fire truck's emergency lights and electronic siren. Approximately 200 feet from the Refugee Road and Brice Road intersection, where the accident occurred, there is a curve in the road, and Sheridan slowed the fire truck through the curve.

{¶ 16} After the curve, Sheridan could observe the Refugee Road and Brice Road intersection. At that time, Engine 32's speed was approximately 35 m.p.h., which is the speed limit on Refugee Road. Sheridan observed "fairly heavy" traffic at the intersection. (Sheridan Aff. at ¶ 16.) The light was red for the fire truck and other vehicles traveling westbound on Refugee Road. Sheridan testified that he scanned the oncoming lanes of traffic to look for moving vehicles, and he pulled the air horn on Engine 32 in "short bursts to warn vehicles" of the approaching fire truck at approximately 40 feet from the intersection. (Sheridan Aff. at ¶ 17.) Sheridan further testified that nothing obstructed his view of the north and southbound lanes of Brice Road and, seeing no movement from vehicles in the oncoming lanes, he proceeded into the intersection without stopping. According to Sheridan's testimony, he believed it was safe to enter the intersection against a red light because "every lane [was] full" and "every vehicle [was] stopped." (Sheridan Dep. at 64.)

{¶ 17} Sheridan testified that before he entered the intersection, he observed Glenn "sitting in the left turn lane [on southbound Brice Road] waiting on oncoming

traffic so she could make her left turn."  (Sheridan Dep. at 67.)  Sheridan further testified that when he started to accelerate Engine 32 through the intersection, Glenn's vehicle began to move to make the left hand turn, from southbound on Brice Road to eastbound on Refugee Road, resulting in the collision.  Sheridan estimated that when Engine 32 struck Glenn's vehicle, it was travelling approximately 35 m.p.h.  Thus, according to Sheridan's testimony, Glenn's vehicle was stationary as Engine 32 approached the intersection, but she then moved, causing the collision.

{¶ 18}  Firefighter Heisterkamp, who was a passenger in Engine 32, also testified that he did not see any moving vehicles as the fire truck approached the intersection.  However, other witnesses testified that Glenn's vehicle did not completely stop at or near the intersection prior to the collision.  Firefighter Sulsburey, who followed Engine 32 as a passenger in "Ladder 32," a ladder fire truck, testified that "all vehicles at the intersection of Brice Road and Refugee Road [were] stopped * * * when Engine 32 approached the intersection."  (Sulsburey Aff. at ¶ 9.)  But Sulsburey also testified that he "did not witness the small sedan traveling southbound on Brice Road come to a complete stop at the intersection."  (Sulsburey Aff. at ¶ 9.)

{¶ 19}  Allmendinger, who was traveling westbound on Refugee Road, was stopped in her vehicle at the red light at Brice Road.  Allmendinger testified that she could see the approaching fire truck in her rearview mirror, and when she looked forward at the intersection, "[a]ll the cars at the intersection were stopped except for one."  (Allmendinger Aff. at ¶ 7.)  Allmendinger further testified, "The fire engine and a car that was in the turn lane on Brice Road collided in the intersection.  I did not see the car on Brice Road come to a complete stop."  (Allmendinger Aff. at ¶ 10.)  Thus, there is a genuine dispute as to whether Glenn's vehicle ever completely stopped as the fire truck approached the intersection.

{¶ 20}  There is also a genuine dispute as to whether Engine 32's electronic siren was on as it approached and entered the intersection.  As noted above, Sheridan and Heisterkamp testified that Engine 32's electronic siren was on when they exited the fire station.  Allmendinger testified that in addition to seeing the emergency lights, she heard the siren and air horn.  But other witnesses testified they did not hear a siren.  Castle testified that he drove south through the Refugee Road and Brice Road intersection

shortly before the accident. Castle heard the air horn of the fire truck soon after he crossed the intersection, and he looked in his rearview mirror to try to locate the fire truck. Two or three seconds after Castle heard the air horn, he saw the collision in the intersection as he looked in the rearview mirror. Castle testified that he did not hear a siren before or after the collision, specifically noting he was "100-percent sure that the sirens were not on." (Castle Dep. at 17.) Bendik, the manager of a business adjacent to the Refugee Road and Brice Road intersection, testified that he was taking trash to a dumpster when he heard the fire truck's air horn and, two or three seconds later, the collision. Bendik testified that he did not hear a siren. Thus, while there is no dispute that Sheridan activated Engine 32's air horn two or three seconds before the collision, the testimony was conflicting as to whether Sheridan also activated the fire truck's electronic siren.

{¶ 21} As to the issue of whether Sheridan engaged in willful misconduct, the executor argues that Sheridan acted willfully by intentionally violating the city's Standard Operating Procedure 01-01-01. This rule provides that during "emergency response," drivers of "all Fire Division vehicles shall bring the vehicle to a complete stop" for red traffic lights. (Standard Operating Procedures 01-01-01, XII.) The executor's argument is unpersuasive. In *Anderson*, the Supreme Court noted that, "it is well established that the violation of a statute, ordinance, or departmental policy enacted for the safety of the public is not per se willful, wanton, or reckless conduct, but may be relevant to determining the culpability of a course of conduct." *Anderson* at ¶ 37. Additionally, it is undisputed that, prior to the accident, Sheridan was aware of city protocol requiring firefighters to stop at red lights, even in emergencies. Sheridan testified that he does not always abide by that protocol, and he did not follow it in this case. However, Sheridan's violation of city protocol in this case does not reasonably demonstrate that he drove Engine 32 into the intersection with the purpose of causing harm to another. Considering the absence of any other evidence demonstrating such intent, there is no genuine dispute on this issue. Thus, the executor cannot demonstrate willful misconduct under R.C. 2744.02(B)(1)(b).

{¶ 22} Nor can the executor demonstrate Sheridan's conduct constituted wanton misconduct under R.C. 2744.02(B)(1)(b). As noted above, there are genuine disputes as

to whether the electronic siren was on and whether Glenn's vehicle came to a complete stop as Engine 32 approached. However, construing the evidence most favorably toward the executor, no reasonable jury could conclude that Sheridan engaged in wanton misconduct, that is, that Sheridan failed to exercise "any care" toward other motorists.

{¶ 23} The trial court determined that this case is factually similar to *Hunter v. Columbus*, 139 Ohio App.3d 962 (10th Dist.2000). In *Hunter*, the city of Columbus and a Columbus firefighter were sued by the estate of a deceased driver who was struck by a Columbus emergency vehicle. The trial court granted the defendants' motion for summary judgment, finding that the firefighter's conduct was not willful, wanton, or reckless. On appeal, this court reversed and cautioned against using too "simplistic" of an analysis when considering whether an actor used "any care." The "simplistic analysis" rejected by this court in *Hunter* was the proposition that operating an emergency vehicle with lights and sirens running was necessarily sufficient to satisfy the "any care" requirement. *Id.* at 970. In *Hunter*, the emergency vehicle had lights and sirens running but the operator otherwise engaged in "extreme" conduct, namely, going left of center while traveling 26 m.p.h. above the road's 35 m.p.h. speed limit. *Id.* at 971. Because the probability of harm created by the operator of the emergency vehicle was much greater in those circumstances, the finding of "any care" reasonably required more than just lights and sirens. *Id.*

{¶ 24} We disagree with the trial court's application of *Hunter* to this case. The evidence here does not demonstrate facts "extreme enough" to send to a jury the issue of whether Sheridan failed to exhibit "any care." Although there are genuine factual disputes as to whether Engine 32's electronic siren was on prior to the collision, and as to whether Glenn's vehicle came to a complete stop prior to entering the intersection, certain other undisputed facts demonstrated the exercise of care by Sheridan. It is undisputed that the lights of Engine 32 were on as it approached the intersection, that it was traveling at a moderate speed of 35 m.p.h. (the speed limit for the road) at that time, and that Sheridan activated the fire truck's air horn in short, repeated bursts prior to entering the intersection. Although one could reasonably argue that two or three seconds of notice from Engine 32's air horn was insufficient notice of the approaching fire truck, it did provide at least some notice. Evidence that Sheridan provided audible and visual notice

of the fire truck prior to entering the intersection at a moderate speed, combined with evidence of Sheridan's observation that all incoming traffic was stopped, with the possible exception of one slowly moving vehicle, conclusively demonstrate that Sheridan's conduct did not constitute wanton misconduct. He exercised at least some care in trying to prevent a vehicle collision as he proceeded to the reported emergency, and he did not otherwise engage in extreme conduct that would effectively negate or eliminate the significance of the care he did exhibit. Therefore, we disagree with the trial court's application of *Hunter* to the facts of this case.

{¶ 25} Upon reviewing the record, we find that the executor cannot demonstrate the existence of any genuine issue of material fact as to the executor's claims against the city. Construing the evidence most favorably toward the executor, no reasonable jury could conclude that Sheridan's conduct constituted willful or wanton misconduct. Thus, the city is entitled to immunity as a matter of law. We, therefore, find that the trial court erred in denying the city's request for summary judgment. Accordingly, we sustain the city and Sheridan's first assignment of error.

**B.  Second Assignment of Error – Sheridan's Immunity**

{¶ 26} The city and Sheridan's second assignment of error asserts the trial court erred in denying Sheridan's motion for summary judgment. The city and Sheridan cite this court's decision in *Byrd v. Kirby*, 10th Dist. No. 04AP-451, 2005-Ohio-1261 in support of their argument that Sheridan is immune from liability as a matter of law because his conduct was not wanton or reckless. We disagree.

{¶ 27} "The three-tiered analysis regarding the potential liability of a political subdivision 'does not apply when determining whether an employee of the political subdivision will be liable for harm caused to an individual.' " *Stevens v. Maxson*, 10th Dist. No. 12AP-672, 2013-Ohio-5792, ¶ 12, quoting *Mashburn v. Dutcher*, 5th Dist. No. 12 CAE 010003, 2012-Ohio-6283, ¶ 20, citing *Cramer v. Auglaize Acres*, 113 Ohio St.3d 266, 2007-Ohio-1946, ¶ 17. Rather, R.C. 2744.03(A)(6) sets forth the immunity of employees of political subdivisions and the exceptions thereto. *Stevens* at ¶ 12. As relevant here, R.C. 2744.03(A)(6)(b) provides immunity for a political subdivision employee who acts within the scope of his or her duties unless "[t]he employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner."

{¶ 28} The executor does not allege that Sheridan acted with malicious purpose or in bad faith, and we have determined, in regard to the claims against the city, that Sheridan did not engage in wanton misconduct. Thus, the issue of Sheridan's liability centers on whether his conduct reasonably could be construed as reckless.

{¶ 29} The city and Sheridan argue this court should apply the reasoning of *Byrd*, wherein this court found no genuine dispute as to whether a police officer's conduct was reckless. Although the *Byrd* case also involved an emergency vehicle colliding with another vehicle at an intersection, it is distinguishable. In *Byrd*, the police officer activated his cruiser's lights and siren for an emergency call, and, after confirming all incoming traffic was stopped at an intersection, the officer proceeded against a red light into the intersection. The driver of another vehicle, which was initially stopped at the intersection, proceeded into the intersection when his light turned green. The two vehicles then collided. The driver and a passenger (the plaintiffs) of the vehicle testified that they saw no emergency vehicle and heard no siren before the collision. This court determined that, for the purpose of summary judgment, the testimony of the plaintiffs that they did not hear a siren or see emergency lights prior to colliding with a police cruiser was insufficient to counter the testimony of independent witnesses who affirmatively stated that the lights and siren were activated. *Byrd* at ¶ 24. Here, independent witnesses disagreed as to whether Sheridan activated the electronic siren. Additionally, in *Byrd*, there was no dispute that all oncoming traffic was stopped as the emergency vehicle approached the intersection, but here there is a question of fact as to whether Glenn was stopped or had merely slowed down. *Id.* at ¶ 11-12. Thus, *Byrd* is distinguishable.

{¶ 30} Construing the evidence most favorably toward the executor, the jury could find Engine 32's electronic siren was not activated on the emergency run, and not all vehicles were stopped as Sheridan decided to enter the intersection. A reasonable jury could conclude that Sheridan's conduct of not activating Engine 32's electronic siren during the emergency run, and entering the intersection at 35 m.p.h. against a red light, despite an observable vehicle continuing to move toward the intersection, constituted reckless conduct. Therefore, we agree with the trial court's finding that a genuine dispute exists as to whether Sheridan operated Engine 32 in a reckless manner.

{¶ 31} Because we find no error in the trial court denying Sheridan's request for summary judgment, we overrule the city and Sheridan's second assignment of error.

**V.  Disposition**

{¶ 32} Having sustained the city and Sheridan's first assignment of error and overruled their second assignment of error, we affirm in part and reverse in part the judgment of the Franklin County Court of Common Pleas.  Accordingly, this matter is remanded to that court for further proceedings in accordance with law and consistent with this decision.

*Judgment affirmed in part and reversed in part;*
*cause remanded.*

TYACK, J., concurs.
SADLER, J., concurs in part and dissents in part.

SADLER, J., concurring in part and dissenting in part.

{¶ 33}  I concur with the majority's holding that the trial court erred in denying the city's request for summary judgment and that firefighter Sheridan did not engage in willful or wanton misconduct.  However, I disagree with the majority's holding that there remains issues of material fact on the question of whether Sheridan's conduct could reasonably be construed as reckless.  Accordingly, I respectfully concur in part and dissent in part.

{¶ 34} Summary judgment in favor of an employee of a political subdivision asserting immunity under R.C. 2744.03(A)(6) is proper where circumstances leading to a vehicle collision do not demonstrate reckless conduct.  *Byrd v. Kirby*, 10th Dist. No. 04AP-451, 2005-Ohio-1261, ¶ 28; *Hewitt v. Columbus*, 10th Dist. No. 08AP-1087, 2009-Ohio-4486, ¶ 33-34.  Such determination is made on a case-by-case basis.

{¶ 35} "Reckless conduct is characterized by the *conscious disregard* of or *indifference* to a known or obvious risk of harm to another that is unreasonable under the circumstances and is *substantially greater than negligent conduct*."  (Emphasis added.) *Anderson v. Massillon*, 134 Ohio St.3d 380, 2012-Ohio-5711, paragraph four of syllabus. For example, this court has stated that "[f]or purposes of R.C. 2744.03(A)(6)(b), recklessness has also been defined as a ' "perverse disregard of a known risk." ' " *Hewitt*

at ¶ 32, quoting *Byrd* at ¶ 27, quoting *Lipscomb v. Lewis*, 85 Ohio App.3d 97, 102 (12th Dist.1993).

{¶ 36} Unlike the majority, I find *Byrd* to be instructive and not sufficiently distinguishable from the facts herein. The *Byrd* court determined that, despite entering an intersection against a red light at a speed of approximately ten miles over the speed limit, police officer Kirby was entitled to immunity as a matter of law. The court additionally noted that Kirby slowed his patrol car "to make sure that conflicting traffic had stopped." *Id.* at ¶ 11. In *Byrd*, we stated:

> Police runs in response to emergencies inevitably entail some degree of risk both to the responding officer and affected traffic. Nonetheless, Ohio law provides that vehicles on such emergency runs may, with lights activated and with due regard for the safety of others, exceed the posted speed limit (R.C. 4511.24) and proceed through red lights or stop signals (R.C. 4511.03). Because the law and current police and emergency practice clearly contemplate the necessity in some circumstances of such emergency runs, a responding officer does not create an "unreasonable" risk of harm by engaging in an emergency run merely because such a response creates a greater risk than would be incurred by traveling at normal speed and in compliance with opposing traffic signals. The question of unreasonable risks must be weighed in terms of what is acceptable in the context of an emergency run, not ordinary driving conditions; an officer responding at ten miles over the posted speed limit with lights flashing, siren on, and slowing as he approaches an intersection does not create the same risk as one traveling 100 miles per hour at night on unfamiliar roads while pursuing in violation of departmental policy, as was the case in *Wagner v. Heavlin* (2000), 136 Ohio App.3d 719, 737 N.E.2d 989, a case cited by appellants.

*Id.* at ¶ 28.

{¶ 37} Here, the facts are undisputed that, while on an emergency run, Sheridan slowed the fire truck prior to entering the intersection, operated the fire truck at a moderate and lawful speed with lights activated and audible warnings, and assessed the intersection for moving vehicles. There is no record evidence to show that Sheridan either consciously disregarded or was indifferent to the risk of harm to cars moving into the intersection.

{¶ 38} In fact, Sheridan's *conscious regard* for this risk is demonstrated by his observation of the intersection set forth in his testimony that: "Every vehicle is stopped, which is what I'm looking for. * * * [E]very lane is full. * * * [Glenn] was never moving from the time I could see the intersection. * * * She didn't start to make her turn until I was already at the edge of the intersection." (Sheridan Dep. at 64, 67, 86.) In his sworn affidavit, Sheridan further testified that:

> 16. As we approached the intersection, I slowed Engine 32. Traffic was fairly heavy at this time, so I was looking at each oncoming lane for vehicles that were moving.
>
> 17. Approximately forty feet from the intersection, I began to pull the air horn in short bursts to warn vehicles at the intersection of the approaching engine.
>
> * * *
>
> 24. As I was pulling the air horn in short bursts and slowed Engine 32, I was looking at each oncoming lane. In particular, I was looking for vehicle movement.
>
> * * *
>
> 27. I did not see any vehicle movement. Each oncoming lane had a car stopped in the lane.
>
> 28. The fact that each lane had a stopped vehicle was significant to me. With a stopped vehicle in each oncoming lane, I felt there would be less of a chance for a vehicle to appear suddenly in my path of travel.
>
> * * *
>
> 30. Even though the light was red for my lane of travel, I did not bring Engine 32 to a complete stop. I did not stop because I perceived all oncoming vehicles were stopped.

(Sheridan Aff. at 3-4.)

{¶ 39} While I agree with the majority that "there is a question of fact as to whether Glenn was stopped or had merely slowed down," I do not find the question to be material. (Majority decision at ¶ 29.) The fact that Sheridan did not see Glenn's car in time to stop or that he may have misperceived a slowing vehicle for a stopped vehicle, while tragic, is

not the equivalent of a conscious disregard or indifference for that risk when paired with the undisputed facts of Sheridan's exercise of care. Alternatively, on this record, no reasonable juror could view Sheridan's conduct as "substantially greater than negligent conduct." *Anderson* at paragraph four of the syllabus. As a result, in my view, Sheridan's conduct does not meet the definition of "reckless" as a matter of law.

{¶ 40} Even construing the evidence in a light most favorable to the executor, the circumstances leading to this tragic collision do not demonstrate that Sheridan engaged in reckless conduct. Therefore, I would find the trial court erred in finding that Sheridan failed to demonstrate his entitlement to immunity.

{¶ 41} Accordingly, I would reverse the trial court's decision in its entirety and remand for summary judgment to be granted in favor of both the city and Sheridan. Because the majority does not, I respectfully concur in part and dissent in part.

————————————